UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Steven R. Thomsen,

              Plaintiff,

    vs.                          REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

              Defendant.       Civ. No. 01-1386 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions for Summary Judgment. The Plaintiff has appeared by Jennifer G. Mrozik, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II.  Procedural History

The Plaintiff filed an application for DIB on September 27, 1999, in which he alleged that he had become disabled on December 13, 2000.  [T. 16].  The Plaintiff had previously filed for a period of disability and DIB, which was denied by an Administrative Law Judge ("ALJ") on July 21, 1999.  [T. 231-244].  The Plaintiff did not seek review of the ALJ's denial, and that decision became final.  [T. 17].  The Plaintiff remained insured for disability benefits only through December 31, 2000.  [T. 17, 319].  Therefore, in order to obtain DIB, the Plaintiff's application must establish that he was disabled prior to December 31, 2000.  See, Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001)("[T]he claimant must also show that he or she became disabled during the period in which he or she met the disability insured status requirements."), citing Title 42 U.S.C. §§423(a), 416(i).  The Plaintiff's claims were denied upon initial review, and upon reconsideration.  [T. 268-72, 274-76].

The Plaintiff timely requested a Hearing before an ALJ, a Hearing was conducted,  and on May 3, 2001, the ALJ rendered an unfavorable decision.  [T. 250-261].   The Plaintiff requested an Administrative Review before the Appeals Council which, on June 19, 2001, declined to review the matter further.  [T. 10].  On July 30, 2001, the Plaintiff sought judicial review of the Commissioner's final decision, and

filed a Complaint.  See, Complaint, Docket No. 1.  However, the cassette tape of the Hearing on May 31, 2001, could not be located, and the District Court adopted our Recommendation that the matter be remanded to the ALJ for a second Hearing.  See, Order, Docket No. 13.

On August 5, 2003, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel.  [T. 16].  Thereafter, on October 9, 2003, the ALJ issued a decision which denied the Plaintiff's claim for benefits.  [T. 13-27].  The Plaintiff requested an Administrative Review before the Appeals Council which, on March 24, 2004, declined to review the matter further.  [T. 8-9].  Thus, the ALJ's determination became the final decision of the Commissioner.  Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

### III.   Administrative Record

A.   Factual Background.  At the time of the ALJ's decision, the Plaintiff was forty-five (45) years old, and was a high school  graduate with training as a tool and die maker.  [T. 17].  The Plaintiff had prior work experience as a bartender, fry cook, security guard, machine operator, and machinist.   The Plaintiff alleges that he cannot work due to his back and neck pain, as well as his depression.  [T. 332-341, 430].

- 3 -

1.     <u>Plaintiff's Physical Impairments</u>.   In the early 1990's, the Plaintiff developed, and sought treatment for, constant lower back pain. [T. 18].   An examination of an MRI of the Plaintiff's back, by Dr. John E. Sherman, demonstrated Grade I spondylolisthesis[1] with minimal foraminal stenosis at L5-S1.[2]  [T. 445].  The initial treatment of the symptoms failed and, on July 25, 1994, the Plaintiff underwent an L5 laminectomy ,with posterolateral fusion of L5-S1utilizing an iliac crest bone graft.[3]  [T. 443].  On September 29, 1999, the Plaintiff reported that the operation had offered pain relief for his back, but he reported that the pain had worsened over a period of time.  [T. 470].  An X-ray conducted on December 11, 1998, disclosed that

---

[1]Spondylolisthesis is the "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect."   <u>Dorland's Illustrated Medical Dictionary</u>, p. 1684 (29th Ed. 2000).

[2]Foraminal stenosis is an "abnormal narrowing of a duct or canal" of a "natural opening or passage," especially, "through a bone."   <u>Dorland's Illustrated Medical Dictionary</u>, supra at 696, 1698.

[3]A laminectomy is a surgical operation where the posterior arch of a vertebra, between the thorax and pelvic region of the back, is excised.  <u>Dorland's Illustrated Medical Dictionary</u>, supra at 960.

there was a 3 to 4 millimeter anterior subluxation of L5 on S1, which did not change during flexion or extension.[4]  [T. 544].

The Plaintiff has also sought treatment for neck pain.  In 1995, the Plaintiff suffered a minimally displaced avulsion fracture at C2 as a result of a motor vehicle accident.  [T. 608].  An X-ray conducted on January 13, 1999, evinced spurring at C4-5 with right neural foraminal stenosis, and reduction of the diameter of the spinal cord at the C5-C6 levels.  [T. 542].

On December 28, 1995, the Plaintiff met with Dr. Rudolph Hass for a Veterans Affairs ("VA") compensation and rating exam.  [T. 612-13].  At the exam, Dr. Hass noted that the Plaintiff kept his neck rigid, moved with a great deal of difficulty, and had a great deal of difficulty getting up as well as dressing.  Id.

On July 16, 1996, the Plaintiff met with Dr. Scott W. Sorensen for another VA compensation and rating exam.   [T. 607-611].   At that examination, the Plaintiff reported , in part:

> The [Plaintiff] has a history of chronic low back pain which is constant in nature but varies in degree.  The pain will awaken him from sleep each night.  It is lessened if he gets up and moves around.

---

[4]A subluxation is defined as an incomplete or partial dislocation.   Dorland's Illustrated Medical Dictionary, supra at 1719.

*     *     *

> Currently the [Plaintiff] states he has a constant pain in his neck.  He is unable to turn his head from side to side or bend forward at the neck.  He has noted progressive gradual loss of range of motion of the neck since the [1980 or 1981 accident].  He states that he has noted no numbness or weakness in his arms. * * * He currently takes occasional over-the-counter Tylenol for his back an neck problems.

[T. 607-08].

Dr. Sorensen, in his report, noted the following:

> Range of motion of the cervical spine shows him to be unable to flex his neck forward at all.  Extension of the cervical spine is to 15, lateral flexation is to 15 on the right and 15 to the left.  Rotation of the cervical spine is 10 to the right and the leg.   The range of motion of the lumbar spine shows flexion of 30, extension 0.  He is unable to extend his lumbar spine.  Lateral flexion 15 to the right and the left with rotation of 15 to the right and the left.  It should be noted that the extremes of theses range of motions cause noticeable pain and discomfort to the patient.

[T. 608-09].

Dr. Sorensen concluded that the Plaintiff suffered from chronic low back pain with a previous history of spinal fusion at the L5-S1 level, neck pain, and a decreased range of motion.  [T. 609].  The Plaintiff was given a rating of 60% disabled, and granted an "entitlement to individual unemployability" by the VA, retroactive to August 11, 1995.  [T. 611].

On August 28, 1998, at a medical examination at the Minneapolis Veterans Administration Medical Center ("VAMC"), the examining physician noted that the Plaintiff complained of sharp pain across his lower back, which radiated across his legs, causing the Plaintiff to fall a couple of times. [T. 519-20]. The physician noted that the Plaintiff walked with an antalgic gait, but had a motor strength rating of 5/5 and showed positive Waddell's signs.[5]

On January 14, 1999, the Plaintiff was seen at the VAMC for various physical ailments, including his chronic pain, and a numbness in his left arm. [T. 510]. The Plaintiff was diagnosed with probable ulnar neuropathy in his left arm. Id. The examination report reflects that the Plaintiff declined an EMG, or another surgical consult, which would have addressed the ulnar neuropathy. The Plaintiff also had "no

---

[5]As summarized in Mettlen v. Commissioner of Social Security Administration, 2003 WL 1889011 (E.D. Tex. 2003):

> When evaluating patients complaining of back pain, physicians employ the term "Waddell signs" (comprising eight clinical findings) to indicate that one or more complaints of pain are not caused by physical abnormality. The presence of three or more of these findings is "usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality."

Id. at *9 n. 15, citing Attorneys Medical Deskbook, §11:2 (3rd Ed. 1993).

current deficits," and did not wish to pursue any further work up concerning his lower back pain.  Id.

In May of 1999, the Plaintiff visited an urgent care medical facility after being hit by a board while engaged in a construction project.  [T. 501-02].

On February 17, 2000, the Plaintiff met with a physician for a scheduled appointment.   The treating physician noted that "[the Plaintiff] was involved in absolutely no physical therapy of his own," and "[h]e tried to explain to me that he has integrated his physical therapy recommendations into his lifestyle and cited the example of watching television until his back and neck hurt and then when he had to sit up counting that as "one sit-up."  [T. 555].

The State Agency physicians also reviewed the Plaintiff's medical records through March 2000.  [T. 21, 575-82].  They concluded that the Plaintiff was fully capable of performing light work.   Id.   The State Agency physicians opined that the Plaintiff would be limited to work that involved occasionally lifting or carrying no more than twenty (20) pounds; frequently lifting or carrying less than ten (10) pounds; standing and/or walking for six (6) out of eight (8) hours in a workday; sitting for a total of about six (6) hours; and avoiding repetitive push/pull actions in the lower extremities.  [T. 576].

- 8 -

The remainder of the Plaintiff's medical visits, for physical ailments in 2000, centered around treatment for a tick bite, which the Plaintiff believed could have been indicative of Lyme disease.  Subsequent tests revealed that the Plaintiff did not suffer from Lyme disease.  [T. 584-98].

2.	The Plaintiff's Mental Ailments.  On September 29, 1999, the Plaintiff met with Dr. Joseph L. Rodgers in order to follow up on the his recurrent major depressive disorder, and chronic back and neck pain.  [T. 470].  Dr. Rodgers noted that, although the Plaintiff claimed back pain, there was no obvious tenderness to palpation in those areas.  The Plaintiff also described pain radiating down his left leg, but advised that he could not describe the pain below the knee because he only had experienced the pain on two (2) occasions since his prior back surgery.  Id.  The Plaintiff also mentioned the ineffectiveness of his pain medication, but reported that he was not taking the medication on a regular basis.  Dr. Rodgers assessed the Plaintiff's status, as of that examination, in part, as follows:

> [Major Depressive Disorder], improved.   2) Polysubstance dependence, early remission.  3) Chronic pain syndrome. I reviewed an [Minnesota Multiphasic Personality Inventory] performed on the patient in April of this year.  Though certainly needing to be interpreted with caution in this patient, what is striking is his very high score for hypochondriasis and for the astoundingly elevated score of

> 105 for hysteria.   Overall, I would have to say that I
> strongly oppose the use of opioid analgesics in this patient.
> I think it is extremely doubtful that he reliably reports his
> pain.   He demonstrates unreliability with regard to his
> current medications.

Id.

On November 21, 1999, the Social Security Administration ("SSA") arranged for the

Plaintiff to meet with Dennis O. Andersen ("Andersen"), who is a licensed

psychologist, for purposes of a psychological evaluation.  [T. 458-64].

The Plaintiff arrived early at the meeting, after being driven by his girlfriend.  [T.

458].  However, the Plaintiff represented that he had the ability to drive one hundred

(100) miles, but would likely experience pain for the following couple of days.

Andersen found that the Plaintiff's memory was intact, but that his concentration was

rather negatively impacted by psychiatric issues.  [T. 463-64].  Andersen noted that

the Plaintiff had suffered a "longstanding history of polysubstance

abuse/dependence," of which had been in remission since his last treatment program

of 1999.  Id.  Anderson reported that the Plaintiff appeared to be experiencing

moderate level dysthymia,[6] uncontrolled by medication, with accompanying anxiety

features; depression, mild anhedonia, and that the Plaintiff's rate and pace of work

---

[6]Dysthymia is defined as a disorder pertaining to depression.  See Dorland's
Illustrated Medical Dictionary, supra at 559.

have "virtually ceased."   Id.   The Plaintiff was assigned a global assessment of functioning ("GAF") score of 55.[7]   The Plaintiff, at that examination, reported that he was likely to be irritable and crabby, and that he had lost interest in many of his prior activities.   The Plaintiff reported taking various medications, including: the occasional use of Trazodone;[8] Tramadol;[9] Jenaflex, which is an antibiotic; and Tylenol III.  [T. 460].

As to the Plaintiff's daily activities, the Plaintiff reported arising daily "between eleven and noon," and showering or bathing every other day.  He stated that his cooking capability was very good, and that, while his fiancee is responsible for most

---

[7]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 2000).  On the 100 point scale, a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning, and 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

[8]Trazodone is "an antidepressant used to treat major depressive episodes with or without prominent anxiety."  Dorland's Illustrated Medical Dictionary, supra at 1868.

[9]Tramadol hydrochloride is an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery. Dorland's Illustrated Medical Dictionary, supra at 1862.

of the housekeeping duties, he would perform them if "the day is good."  [T. 462-63].

During the evening, the Plaintiff would play solitaire, and would also read books,

although he would forget most of what he had immediately read.  [T. 463].  He and his

fiancee had initial contacts with other couples.  The Plaintiff also reported that he and

his fiancee used to attend movies, but that it had became increasingly uncomfortable

to do so.  Id.

On January 17, 2000, R. Owen Nelson ("Nelson"), who is a State Agency

psychologist, reviewed the medical records and arrived at a mental residual functional

capacity assessment.  [T. 561-63].  Based on the evidence, Nelson concluded that the

Plaintiff retained the capacity to concentrate on, understand, and remember, routine,

repetitive tasks, and three and four step, uncomplicated instructions, but would have

moderate or marked problems with detailed or complex instructions.  [T. 563].

Nelson further opined:

> The claimant's ability to carry out tasks with adequate
> persistence and pace would be moderately impaired, but
> adequate for routine tasks.

> *     *     *

> The claimant's ability to interact and get along with co-
> workers would be mildly to moderately impaired, but
> adequate for superficial contact.

>The claimant's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.
>
>The claimant's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.
>
>The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.

[T. 563].

On August 3, 2000, the Plaintiff met with Dr. Kathleen Cody, who is a VAMC staff psychiatrist, for a regular medication management appointment. [T. 586]. Dr. Cody noted that the patient was under familial stress, but that his appetite was good, and his energy level was fair. Dr. Cody reported that the Plaintiff's mood was depressed, but his thoughts were coherent, logical, and goal directed, with an "excessive focus on physical pain." Dr. Cody prescribed additional medication, and referred the Plaintiff to the medical clinic to address his pain. [T. 586].

On October 11, 2000, Dr. Cody met with the Plaintiff again, as he complained of "jaw clenching" with every antidepressant that he had tried. [T. 604]. However, after discussing the medication with Dr. Cody, the Plaintiff decided that "it was not bad enough to try another change." He also felt that the Tramadol was not helping his

back pain.  Id.  Dr. Cody also signed a letter for the Plaintiff to receive a disability student loan.

On March 19, 2001, Dr. Cody completed a "Medical Assessment of Ability to Do Work Related Activities (Mental)" form, which addressed the Plaintiff's ailments. An "unlimited or very good" assessment meant that the Plaintiff's ability to function in that area was more than satisfactory; "good" meant that the ability was limited, but satisfactory, and "fair" meant that the ability was seriously limited, but not precluded. [T. 624]. Dr. Cody concluded that the Plaintiff had either an unlimited or very good ability to follow work rules, relate to co-workers, deal with the public, use judgment, maintain personal appearance, relate predictably in social situations, and demonstrate reliability.  [T. 624-26].  Dr. Cody recorded that the Plaintiff had a "good" ability to interact with supervisors, function independently, maintain attention/concentration, and understand simple or complex instructions, and behave in a emotionally stable manner. Id.  The only "fair" rating was for the Plaintiff's ability to deal with work stresses.  Id.

On March 29, 2001, the Plaintiff met with VAMC staff psychologist, Dixie L. Grace ("Grace").  [T. 636-38].  Grace noted that the Plaintiff "said his neck is not too painful, but is always stiff and uncomfortable * * * [and] rated his pain at a level 2 on a 10-point scale of pain intensity."  [T. 637].  The Plaintiff also reported sleeping only

four (4) to six (6) hours of light sleep a night, and having feelings of hopelessness and

frustration stemming from his disability.  Id.  Grace also noted as follows:

> [The Plaintiff] lives with his fiancee and her two daughters.
> He has been on disability for 5 years and is unemployable.
> He does spend time on the computer but could not report
> many activities.  He spends much of his time lying down or
> soaking in the tub.  He does not drive and is quite isolated.
> He said he copes with his pain by the support of his
> fiancee.

[T. 637-38].

Grace assessed the Plaintiff's GAF score as 65, consistent with mild symptoms, such

as depressed mood, but functioning pretty well. [T. 19, 638].

B.    Hearing Testimony   The Hearing on April 16, 2003, commenced with

some opening remarks by the ALJ.  [T. 196].  The ALJ noted that the de novo Hearing

was pursuant to a Court remand.   Id.   The ALJ observed that the Plaintiff had

submitted medical records on the day prior to the Hearing, and the ALJ scheduled a

supplemental Hearing, in order to take the testimony of the experts, after they had an

opportunity to review those records.   The Plaintiff's attorney did not have any

objections to any of the evidence.

The Plaintiff testified that he was right-handed, was six feet tall, and weighed

approximately 215-220 pounds on December 31, 2000.  [T. 197].  The Plaintiff was

married, did not have any children under the age of eighteen (18), and had graduated

from high school, and had spent one (1) year at a vocational school where he studied machine tool and die casting.  Id.

The Plaintiff testified that he had last worked in 1995, as a bartender, and had stopped working as a result of an aggravation of a neck injury.  [T. 198].  He stated that he had received most of his medical care at the VAMC, but a spinal fusion was performed at another medical facility.  The Plaintiff testified that he had attended pain clinics and had been involved in physical therapy, and had been involved in "more tests than I can probably count."  [T. 198-99].  The ALJ then inquired about the Plaintiff's experiences with depression.  [T. 199].  The Plaintiff responded that he was experiencing depression at the time he had stopped working, and that he had sought treatment comprising antidepressant medications, and therapy with a psychiatrist.

The ALJ then began addressing the Plaintiff's various physical ailments, specifically asking how long the Plaintiff could walk at any one time.  [T. 199].  The Plaintiff responded that, "it's kind of – it's hard to explain but if I was walking along, there's no time or distance or anything, I'd get, every once in a while, I'd get a stabbing pain in my low back and it would take my left leg out so I'd go down," "[a]nd never really found a time or nothing to set that off."  Id.   The Plaintiff also

testified that standing still was the worst action of all, and would "get him real fast," but had difficulty remembering how long he could stand at one time.  [T. 200].

The ALJ asked the Plaintiff about his ability to sit or to lift objects.  Id.  The Plaintiff stated that he had to keep shifting his weight while sitting, in order to prevent the onset of pain, and that he avoided lifting objects, but hypothesized that twenty (20) pounds would be the absolute limit to his lifting ability.  [T. 200-01].  The Plaintiff stated that he had problems with bending and stooping, as he was able to "get down there all right," but could not "get back up."  [T. 201].

The ALJ inquired about the Plaintiff's daily routine.  Id.  The Plaintiff testified that he would rise from bed at around noon or 1:00 o'clock p.m. and that his routine "basically amounted to trying to stay out of pain because too much getting up, walking around, I mean, I'd sit for a little while and adjust myself, you know, and play around on the computer a little bit but I could never get too in-depth because I can't stay there for any length of time.  Id.  The Plaintiff stated that he often spent time with his family, and would help out with "very minor" household chores.

The Plaintiff testified that, despite a recurrence in his drinking, he no longer used drugs or alcohol, and that he had "no urges no more."  [T. 202].  The ALJ noted that

the Plaintiff had provided a list of medications, which he was currently taking, and concluded his questioning.  Id.

Then, the Plaintiff's attorney questioned the Plaintiff about the events of his life that were going on during the time period in question, noting that many members of the Plaintiff's family were receiving counseling.  Id.  The Plaintiff responded that, although many of his family members required counseling, it was not familial stress that brought about his depression.  [T. 203].  The Plaintiff testified that he was unsure what brought his depression on, but that it was "fueled a lot and made worse by pain." Id.  The Plaintiff correlated his depression to the amount of pain that he was experiencing, stating that it "is a chemical reaction in the brain or something, I guess." Id.  He stated that his pain and depression made him "really crabby," and that  he would snap at people, leading others to avoid him.  [T. 203-04].  The Plaintiff stated that he would, on rare occasion, swear at others, but was physically unable to threaten others.  [T. 204].

The Plaintiff's attorney asked the Plaintiff whether he would "isolate."  Id.  The Plaintiff replied that he would withdraw from everyone, and would retreat to a room, where he would remain away from other people, noting that his wife would say that he is "in a zone," during such episodes.  [T. 204-05].  He also testified that the

medications would not assist him in those situations, and that the medications "fall a little short when I'm really in a lot of pain." [T. 205]. The Plaintiff was then asked about the activities he could perform while in that amount of pain. Id. The Plaintiff responded that he was "not able to do anything in most circumstances," but that "some things I force myself to, regardless of the pain." Id.

The Plaintiff's attorney read from a medical record of December 14, 2000, which noted that the Plaintiff's medication was changed as he began a new medication for his sleep, mood and chronic pain, and that the Plaintiff reported that it had helped, but that his chronic back pain continued, and caused his depression to be worse. [T. 205] The Plaintiff addressed the change in medication, as the depression medicine "had a lot of side effects," noting that the "jaw clenching is normally what got me," but the "one I'm on now does the least amount of that." [T. 206]. The Plaintiff also stated that he had problems sleeping, as he constantly moved to address his back pain, which had been the case since December of 2000. [T. 206-07]. The Plaintiff reported that the Trazodone helped, but knocks him out, and that he was fatigued if he did not take multiple naps. [T. 207]. The Plaintiff stated that he did not know how he could get up and go to work every day, and that he pitied anyone working next to him, as he would be "pretty cranky." [T. 208].

The Plaintiff's attorney then inquired about the Plaintiff's most recent surgeries. Id. The Plaintiff responded that he could not remember the date, or the name of the surgeries, but recalled it was for a pinched nerve. [T. 208-09]. The Plaintiff reported that the surgery was unsuccessful, and that he was "not satisfied with it at all," stating that his prior injury was "like it was sleeping and tingling," and that he currently experienced "tingling with pain." [T. 209]. The Plaintiff reported that his doctors had told him that it would "get better with time." He then testified as to his need for additional back surgery, and possible therapies, to address his pain. [T. 209-10]. The Plaintiff stated that his pain, subsequent to the Hearing in 1999, had become "a lot worse," as he thought he was "getting strong arthritis in it to start with and I think it's just deteriorating." [T. 210-11]. The Plaintiff testified that he thought that there was "no way" in which he could physically function in a manner which would allow he to hold a job for eight (8) hours a day, and for five (5) days a week. [T. 211].

The Plaintiff's attorney then asked the Plaintiff: "If somebody could magically take away the pain, do you think that your mental problems would be disabling, in and of themselves?" Id. The Plaintiff responded that a lot of his mental problems were based on the pain, and that his last psychiatrist had given him pain medication to be taken for one day, every other month, and that medication worked. [T. 211-12]. The

attorney asked why that was not a permanent solution, to which the Plaintiff responded that it was a "band-aid" that did not cure anything. [T. 212]. The Plaintiff noted that his past history with chemicals was a big reason that "I decided I didn't want to do the patches or the injection thing." Id. The Plaintiff stated that he was afraid of his old addictions, and that, if there were any medical devices that would automatically inject him, he would not have a choice, which he thought would prove addictive. [T. 212-13].

The Plaintiff testified that his mental problems would not be disabling in the absence of his pain. [T. 213]. He elaborated, and explained that "[the mental ailments] would be tolerable because if I'm not in pain, my antidepressants work just fine," and "I'm cheerful and happy if I'm not in pain." [T. 214]. However, the Plaintiff believed that the pain itself was disabling, as he would experience difficulties in concentration. He also noted that, in the absence of pain, he would "be a serious risk of re-injury," since he "can throw [his] back out with a sneeze." [T. 215].

The Plaintiff stated that the combination of pain, and his mental responses to the pain, made things worse for everyone around him. Id. He elaborated, stating that, when he experienced "stabbing pains" he would lose his concentration and train of

thought.  Id.  The Plaintiff testified that the pain kept him from reading books, and that

he could no longer "tackle anything complex anymore." [T. 216].

Then, the Hearing continued with the questioning of the Plaintiff by the Medical

Expert ("ME").  The ME asked if Dr. Cody was the Plaintiff's treating psychiatrist, to

which the Plaintiff responded that she was until approximately 2002.  [T. 217].  The

Plaintiff testified that he had been on the antidepressant Wellbutrin, which had the least

number of side-effects, since Dr. Cody prescribed it at the end of 2000. [T. 217-18].

The Plaintiff also stated that he took Trazodone on a couple of occasions, but it gave

him "hangover-like" side-effects.   [T. 218].    The Plaintiff testified that he has

maintained his sobriety, and that he met with his social worker for treatment on a

monthly basis during the year of 2000.   [T. 219].   In response to the ME's

questioning, the Plaintiff also stated that the humidity of the region had prompted the

Plaintiff to consider moving to Arizona.   [T. 220].   The Plaintiff asserted that his

medications, and therapy with Dr. Cody, were a step in the right direction.  [T. 220-

21].

Then Hearing continued with the Vocational Expert ("VE") asking the Plaintiff

about his past work history.  [T. 221].  The Plaintiff responded that his last job was

as a bartender in 1995, and that the other jobs were all held before his bartender

experience.   [T. 222-23].   The Hearing concluded with the scheduling of the Supplemental Hearing.  [T. 223].

The Supplemental Hearing, which was held on August 5, 2003, commenced with some opening remarks by the ALJ.  [T. 163].  The Hearing continued with the testimony of the ME.  [T. 164].  The ALJ asked the ME to opine as to which impairments she believed were exhibited by the Plaintiff, based upon the Record.  Id. The ME began by summarizing the reported ailments that were contained in the Plaintiff's medical record.   [T. 164-66]. The ME recounted that the Plaintiff had reported, or had been diagnosed with, depression and dysthymia. [T. 164].  The ME noted that the Plaintiff scored a 36 on the Beck Depression Inventory, in February of 1999, which was indicative of the bottom end of severe depression but, by March of 1999, the Plaintiff was "doing a lot better on Paxil". Id.  The ME recounted that, in May of 1999, the Plaintiff was diagnosed with major depressive disorder in remission, but that the Plaintiff reported varying degrees improvement and regression, in dealing with his depression, over the following months, with varying medications. [T. 164-66]. The ME also noted that the Plaintiff, at times, felt stressed -- depressed with his family situation, and back pain. [T. 166].  The ME also noted that, under Section 12.09, the

Plaintiff had been identified with alcohol and polysubstance abuse, both in remission.

Id.

The ME concluded that, based on the mental health records, that the Plaintiff's ailments did not meet or equal any listing.  Id.  As related by the ME:

> [T]he [Plaintiff] retains the capacity to concentrate on, understand and remember work-like procedures for at least three or four step instructions and has the ability to carry out such tasks with adequate persistence and pace.  I would say, I would not impose limitations on his contact with coworkers and the general public.  It would be my opinion that he has the capacity to cope with supervision and tolerate or handle stress of the type found in three to four step work steps.

[T. 166-67].

Under the "B" Criteria of the Listings, the ME testified that, in regard to the Plaintiff's ailments, their combined impact would mildly or moderately impair the Plaintiff's activities of daily living, varying "somewhat with his symptoms of depression that in the area of maintaining social functioning that would be a mild degree of limitation." [T. 167].   The ME stated that the Plaintiff would have moderate difficulties in maintaining concentration, pace, and persistence; and that there had been no episodes of decompensation.  Id.

The Plaintiff's attorney then questioned the ME about the Plaintiff's need for partial hospitalization.   Id.   The ME responded that his understanding was that it

followed from the Plaintiff's treatment for chemical dependency.  Id.  The Plaintiff's attorney noted that the chemical dependency treatment was in April of 1999, and he asked the ME about why one would need a partial hospitalization in June of 1999.  [T. 169, 484].  The ME stated that his understanding, from the records, was that the partial hospitalization was to treat the Plaintiff's depression.  [T. 170].  The Plaintiff's attorney then asked if that partial hospitalization would "suggest somebody who is capable or not of functioning outside a structured setting?"  Id.  The ME testified that he believed that the Plaintiff was initially treated for his chemical dependency, but was then treated "in a more straight forward way for the core of depression."  Id.  The ME further stated that "he responded * * * so within a few weeks of being [partially hospitalized], he's reporting that his mood was improved and things of that sort."  Id.

The Plaintiff's attorney then asked the ME why the depression did not constitute a decompensation, to which the ME responded that, "from the records, there appears to be no evidence that his functioning was deteriorating rather they were taking advantage of the fact that his functioning was improved as a result of the previous more intensive treatment to follow-up with similarly intensive treatment to address the depressive issue."  [T. 171].  The ME continued:

> I guess all I'm saying is that there's no evidence that his depression, again, I'm being very clear in my language,

> there's no evidence from the records that * * * as a result
> of say, completing the chemical dependency treatment that
> he had, was more symptomatic in terms of his depression.

Id.

The ME further concluded that the day treatment of the Plaintiff's depression was

likely trying to target the Plaintiff's coping skills to deal with his mood issues.  [T.

172].

The Plaintiff's attorney then addressed the ME's assessment, that the Plaintiff's

response to medication and therapy would vary over time, with a general improvement.

Id.  The ME testified that the assessment in February of 1999 showed that the Plaintiff

had self-reported severe depression but, by May of 1999, the Plaintiff reported feeling

a lot better on Paxil.  [T. 173].  The ME further testified:

> So I think clearly what I intended to do was to capture the
> fact that he does in fact seem to have a dysthymia that does
> tend to wax and wane.  In his case largely with, you know,
> at least for the records in terms of psycho-social stressors,
> things going around, going on in the world, his world
> around him.

Id.

The ME also noted that, when the Plaintiff's condition is generally improving, the

medical records generally fail to cite examples, but when the Plaintiff's condition

worsens, there are generally specific examples cited in the report.  [T. 173-74].  The

Hearing then included a discussion over a record that was labeled with the Plaintiff's name, and Social Security number, but that was likely included in error. [T. 175-176].

The Plaintiff's attorney then made the following inquiry of the ME:

> And he has periods where he's better and he's worse, and there's descriptions about why he's worse, it's not really good descriptions about why he's better, but then you add the additional stressors that didn't exist during that time of going to work eight hours a day, five days a week and it's your testimony that he would be able to do that and do it consistently?

[T. 177].

The ME agreed that the foregoing would be his testimony, based on the medical assessment of the Plaintiff's treating psychiatrist, Dr. Cody. [T. 177-78]. The ME also noted that the Plaintiff had been diagnosed with depressive disorders, but that the Plaintiff had scored a 65 on the GAF, indicating only mild symptoms. [T. 178-79]. The ME did observe that the Grace opinion noted that the Plaintiff's life was heading in a positive direction, but that the substance of the report might seem not to match the given GAF score. [T. 180].

The ME testified that he was a clinical psychologist, who had treated people over an extended period of time, and who had treated patients who had suffered both pain and psychiatric problems. [T. 180-81]. The Plaintiff's attorney asked the ME for his opinion on how pain could impact upon a person's psychological problems. [T.

- 27 -

181].  The ME responded that pain was an ongoing factor, and that the Plaintiff had consistently reported pain throughout the time period in question, but acknowledged there was some questioning of the severity of the pain in the Record.   [T. 181-82]. However, the ME agreed with the statement that the questioning of the Plaintiff's pain had probably been "laid to rest" after consideration of the Plaintiff's ongoing treatments.  [T. 182].  The ME concluded that, based on the medical records, the Plaintiff suffers from a depressive disorder under 12.04, which was exacerbated by pain, whether it would be listed under Sections 12.04, or 12.07.   [T. 182-84]. However, the ME stated that the Plaintiff's treatment providers, over a period of time, had consistently found that the combination of the Plaintiff's pain and depression symptoms would not limit his work related abilities, despite the Plaintiff's problems with things in his everyday life.  [T. 184].

The ME concluded his testimony by stating:

> That generally speaking, his depressive symptoms have been in a well managed contained, things of that sort.  He's consistently seen as having good concentration and interest and things of that sort, generally cheerful. * * * There is, of course, some waxing and waning, but not very consistent and I think that he's good about reporting when his symptoms are getting worse, and his providers are good about offering him different treatment interventions which have typically been medication.

[T. 185].

Thereafter, the Hearing continued with the ALJ posing questions to the VE.

In a hypothetical to the VE, the ALJ asked her to assume an individual of the age and educational background of the Plaintiff, and limited to light work activity.  Id. The hypothetical individual would not utilize any power twisting, or gripping, with the left hand, would not perform repetitive pushing or use of foot controls with the left lower extremity, and would only occasionally bend, squat, twist or crouch.  The person would be limited to three (3) or four (4) step instructions in routine repetitive type work activity.  Id.  The ALJ specifically limited the person, in addition to the limitations set out by the ME, to brief and superficial contact with the public, coworkers, and supervisors.  [T. 185-86].

With those limitations in mind, the VE testified that the hypothetical individual would be able to perform the Plaintiff's past jobs as a machine operator, which is an unskilled position that could be performed either by sitting or standing. [T. 186].

 The ALJ then inquired into the availability of any other simple, unskilled jobs, within the region, that could be performed by the hypothetical individual.  Id.  The VE testified that there were many other positions that would meet the hypothetical, including a polypack heat sealer, which is a light and unskilled position of which there are 2,000 jobs in the regional economy; and a mail clerk sorter, of which there were

2,240 jobs in Minnesota.  Id.  The VE was willing to give other examples, but the ALJ

felt the given examples were sufficient.  Id.  The Plaintiff's attorney did not have any

questions for the VE. [T. 187].

The Plaintiff's attorney then reexamined the Plaintiff, asking about the

unemployable rating that had been made by VA.  The Plaintiff testified that he was

"100% service unemployable," but could not recall the date as to when that

determination was made.  Id.  The Plaintiff stated he had a 30% rating on his neck, but

that, at some point, he was rated at 100% "unemployable." [T. 187-88].  The Plaintiff

also stated that he had been advised to have another fusion surgery performed on his

back.  [T. 188].

The Plaintiff's attorney then made his closing remarks, which summarized the

testimony and the Record.  [T. 189-91]. The ALJ stated that he would keep the

Record open for thirty (30) days, and that he wanted to see a document indicating the

"100% service disability."  [T. 191-92].  At that point, the Hearing concluded.

C.    Post-Hearing Records.  On October 8, 2003, one day prior to the ALJ

issuing his decision, the Plaintiff submitted 123 pages of additional medical records.

[T. 11, 28-153].  Those records were submitted more than sixty (60) days after the

Supplemental Hearing, and they pertained to the period between January 15, 2002, and September 23, 2003.  [T. 8].

> D.   The ALJ's Decision.  The ALJ issued his decision on October 9, 2003. [T. 16-26].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §404.1520.[10]  As a threshold matter, the ALJ noted that the relevant time period, for the Plaintiff's application, required the

---

[10]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

Plaintiff to demonstrate a disability on or before December 31, 2000.  [T. 17].  The ALJ also concluded that the Plaintiff had not engaged in substantial gainful activity, since his alleged onset date.  [T. 18].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in work activity.   After considering the Plaintiff's medical history, and the testimony adduced at the Hearings, the ALJ found that the Plaintiff was impaired by a degenerative disc disease of the cervical and lumbar spine, status post L5-S1fusion; depression; and a history of  substance addiction disorder in sustained full remission. [T. 19-20, 26].  As a result of those impairments, the ALJ found that the Plaintiff had experienced mild to moderate restriction of activities of daily living; mild difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence, or pace.  Id.  The ALJ also noted no evidence of decompensation, or any of the "C" criteria of Section 12.00, were contained in the Record.  Id.  The limitations were based on the testimony of the ME, the conclusions of the State Agency psychological consultants, the Plaintiff's medical records, and the Record as a whole, which the ALJ further detailed.  [T. 20-21].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P of the Regulations.  See, 20 C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's impairments did not meet, or equal, the criteria of any Listed Impairment.  [T. 21].

The ALJ then determined the Plaintiff's residual functional capacity ("RFC").[11] [T. 19-21].  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-8p, and Title 20 C.F.R. §404.1545.  The ALJ concluded that the Plaintiff was credible in regards to his complaints regarding his neck and back pain, his difficulty in concentration, and his irritability toward pain.  [T. 21].  However, the ALJ determined that the Plaintiff was not totally credible, and that his testimony, and allegations of total disability, were not supported because of the inconsistencies in the Record as a whole. Id.

---

[11]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545.

In particular, the ALJ noted that the Plaintiff's treating physicians had raised questions concerning the level of pain experienced by the Plaintiff, in relationship to his medical status in 1998 and 1999, noting that the physician reported full motor strength, and Waddell's signs.  [T. 22-23].  In addition, the ALJ noted that the Plaintiff was engaged in a construction project, as evidenced by his urgent care visit in May of 1999, and that the Plaintiff had failed to pursue treatment on multiple occasions to alleviate his physical pain.  [T. 23].  As to the Plaintiff's mental ailments, the ALJ recounted the Record's multiple reports of improvement, as well as the opinions of the Plaintiff's treating physicians -- who had met with the Plaintiff on multiple occasions over time -- which reflected that the Plaintiff's symptoms were not present "to the degree that would prevent him from engaging in regular work activity."  [T. 23-24].

The ALJ also discounted the finding of "unemployability," which had been made by the VA, noting that such a finding was not binding upon the ALJ.  See, Title 20 C.F.R. §404.1504.  The ALJ also reported that "unemployable," as used by the VA, was undefined, and that the only objective finding was a 60% service-connected disability.  The ALJ found that the issue was moot because he was bound by the

Social Security Act, citing <u>Fisher v. Shalala</u>, 41 F.3d 1261 (8th Cir. 1994), although the ALJ "carefully considered" the findings of the various VA physicians.  [T. 24].

After considering the testimony at the Hearing, the opinions of the Plaintiff's treating physicians, including Dr. Cody, the opinion of the State Agency examining physicians, the objective medical evidence, the Plaintiff's subjective complaints, and the entirety of Record,  the ALJ determined the Plaintiff's  RFC to be as follows:

> The undersigned finds that the claimant retains the residual functional capacity to perform routine repetitive light work involving lifting 20 pounds occasionally and 10 pounds frequently, sitting two hours and standing and/or walking six hours in an eight-hour workday, no power twisting or gripping with the left hand, no repetitive pushing or use of foot controls with the lower extremities, occasional squatting, bending, twisting, and crouching, three to four step instructions, and brief and superficial contact with co-workers, supervisors, and the public.

[T. 21].

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff could not perform his past relevant work, as a bartender, fry cook, security guard, machine operator, and machinist, as he had performed those jobs.  [T. 21-22].

Accordingly, the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, existing in significant numbers in the regional economy, that the Plaintiff could perform given his RFC, age, education, and work

experience. [T. 25-26]. As related by the ALJ, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had found that the Plaintiff could perform work, namely as a polypack heat sealer or a mail clerk/sorter, of which 4,240 combined jobs existed in Minnesota. [T. 25]. The ALJ concluded that the Plaintiff was not disabled, and therefore, was not entitled to a period of disability, or DIB. [T. 25-26].

E. <u>Appeals Council Decision.</u> The Plaintiff submitted written exceptions to the ALJ's decision of October 9, and argued that the ALJ did not lend proper weight to the VA's opinion, and that the ALJ failed to consider the additional medical records that had been submitted to him on the day prior to his decision. [T. 10-12]. The Appeals Council considered the Plaintiff's arguments, but concluded that they did not provide sufficient reason for the Appeals Council to assume jurisdiction. [T. 8]. The Appeals Council noted that the ALJ adequately addressed the VA opinion in his decision, and that the additional records, which had been submitted by the Plaintiff, were untimely, as they were submitted over 30 days after the Record had closed, and were neither new or material, as the earliest of the newly submitted documents was dated over a year after the required date for a finding of disability.

IV. <u>Discussion</u>

A.    <u>Standard of Review</u>.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, <u>Title 42 U.S.C. §405(g)</u>; see also, <u>Moore ex rel. Moore v. Barnhart</u>, 413 F.3d 718, 721 (8th Cir. 2005); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002); <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>Moore ex rel. Moore v. Barnhart</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).   Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."   Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994); see also, <u>Haley v. Massanari</u>, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>. See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

  B. <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

   1. The ALJ Improperly Discredited the Testimony of the Plaintiff.

   2. The ALJ Failed to Give Proper Weight to the VA Opinion of Unemployability.

3.      The ALJ Failed to Fully Develop the Record
         and Include New and Material Evidence.

We address each contention in turn.

1.      Whether the ALJ Improperly Discredited the
         Testimony of the Plaintiff.

a.      Standard of Review.   The governing law makes clear that credibility determinations are initially within the province of the ALJ.   Driggins v. Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).   As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.   See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.   See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).   These requirements are not mere suggestions, but are mandates that

impose affirmative duties upon the ALJ.  <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, supra, and its progeny.  See, e.g., <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996); <u>Shelton v. Chater</u>, supra; <u>Jones v. Chater</u>, 86 F.3d 823 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.  the claimant's daily activities;

2.  the duration, frequency, and intensity of the pain;

3.  precipitating and aggravating factors;

4.  dosage, effectiveness and side effects of medication; and

5.   functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability,

- 42 -

an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487. Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015,

1018 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

It is also settled law that, "when an ALJ fails to believe lay testimony about a claimant's allegations of pain, he should discuss the testimony specifically and make explicit credibility determinations."  Prince v. Bowen, 894 F.2d 283, 286 (8th Cir. 1990); Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984)("We have held that a failure to make credibility determinations concerning such evidence requires a reversal and remand."); but cf., Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)("While it is preferable that the ALJ delineate the specific credibility determinations for each witness, an 'arguable deficiency in opinion-writing technique' does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."), citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).

b.     Legal Analysis.  The Plaintiff argues that the ALJ's credibility determination was unsupported by substantial evidence on the Record as a whole.  In support of this argument, the Plaintiff asserts that the medical record supports his testimony, and that the ALJ failed to properly weigh the Record which included  the testimony of the ME.

In determining the Plaintiff's RFC, the ALJ was obligated to consider all of the Plaintiff's symptoms, including his subjective complaints of physical limitation under the standard enunciated in Polaski v. Heckler, supra at 1322. An ALJ may properly discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, Johnson v. Chater, supra at 947. Here, the ALJ agreed with the Plaintiff's complaint that he experienced numerous ailments, but found that the effects of the conditions were insufficient to render the Plaintiff totally disabled, notwithstanding the Plaintiff's subjective assessments of his physical limitations. [T. 21].

For example, the Plaintiff reported an injury that arose out of his involvement in a construction project which, as noted by the ALJ, gives us pause as to the credibility of the Plaintiff's claims of disabling pain, as construction projects ordinarily require significant physical effort. [T. 23, 501-02]. As noted by the ALJ, "[e]ngaging in a construction project is inconsistent with the [Plaintiff's] allegations that he has radiating pain which causes him to fall down." [T. 23]. The Plaintiff, as noted by the ALJ, also experienced improved pain relief with the treatment of Desipramine and aspirin. [T. 712, 716].

The ALJ also discounted the Plaintiff's testimony regarding disabling physical pain as a result of "the [Plaintiff's] lack of interest in pursuing treatment, noting that Dr. Rodgers' notes indicated that the Plaintiff had little intention of pursing physical therapy."  [T. 23, 555].  The ALJ gave substantial weight to the showings, in the Record, that the Plaintiff's subjective complaints of pain were potentially exaggerated, citing Dr. Rodgers notes, and other notations appearing throughout the Record, that the Plaintiff was prone to hypochondria.  [T. 22-23].

One of the most persuasive sources of evidence, concerning the severity of the Plaintiff's claims of disabling depression, comes from an examination of the records memorializing the Plaintiff's interactions with Dr. Cody, who was the Plaintiff's treating psychiatrist for over two (2) years, including the treatment of the Plaintiff subsequent to the expiration of the proof of disability date.  Dr. Cody opined that the Plaintiff retained the mental capacity to work, despite the Plaintiff's depression, without substantive limitation.  [T. 624-26].  The testifying ME, in adopting an RFC with even greater restrictions than those opined by Dr. Cody, concurred with the assessment that the Plaintiff mental ailments were not so severe as to render the Plaintiff disabled, while noting that the Plaintiff's depression would wax and wane

depending on the surrounding circumstances in the Plaintiff's life, and the optimization of the Plaintiff's medication regimen.  [166-67, 184-85].

While the ME did note some potential toward a discrepancy concerning Grace's rating of a GAF score of 65, which was not fully consistent with the body of Grace's report, we note that the body of the report is a recitation of the Plaintiff's reported medical history, with little opinion by Grace.   In effect, the body of the report reflects the subjective complaints of the Plaintiff, which might not be consistent with Grace's clinical observations.   [T. 179-80, 636-38].   Grace did note that the patient had "depressive disorder, which [wa]s being treated," and "chronic back and neck pain." [T. 638].   However, other than the GAF score, Grace offered little analysis on the Plaintiff's ability to work, or function, in the presence of his mental ailments. Therefore, we find little merit to the Plaintiff's interpretation of the Grace opinion as one that supports a finding of disability.

As discussed later in the body of this Report and Recommendation, we further find that the VA rating of "unemployability" does not substantively conflict with the weight of the Record, so as to undermine the ALJ's assessment of the Plaintiff's credibility.

Accordingly, we find that the ALJ properly discredited the Plaintiff's testimony, after thoroughly reviewing the Record as a whole, insofar as the Plaintiff alleged a total disability. The ALJ provided well-documented reasons for discrediting the Plaintiff's subjective complaints, and those reasons, and the evidence cited, substantially support the ALJ's determination in that regard. "The ALJ is in the best position to gauge the credibility of testimony and is granted deference," Sarna v. Barnhart, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [the claimant's] credibility is primarily a matter for the ALJ to decide."), citing Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001)("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."), citing in turn, Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). Since we find no basis to reverse the Plaintiff's credibility rulings, which were both thorough and well-reasoned, we reject that challenge to the ALJ's determination.

2.    Whether the ALJ Failed to Give Proper Weight to the
VA Opinion of Unemployability.

a.    Standard of Review.   Disability determinations, by other governmental agencies, are not binding upon an ALJ.   See 20 C.F.R. §404.1504. Consequently, our Court of Appeals has recognized that a disability determination, by the VA, is not binding on an ALJ when considering a Social Security applicant's claim for DIB.   See, Jenkins v. Charter, 76 F.3d 231, 233 (8th Cir. 1996), citing Fisher v. Shalala, supra.   However, findings of disability by the VA, and other Federal agencies, "even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision."   Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).

b.    Legal Analysis.   The Plaintiff asserts that the ALJ failed to give proper weight to the finding of disability, and "unemployability," that had been assessed by the VA.   However, the Record makes clear that the ALJ specifically inquired about the findings of the VA.   [T. 187-88, 191-92].   At the Hearing, the Plaintiff replied that he had received a 60% disability rating, and that he was 100% "unemployable."   Id.   In addition, the ALJ expressly addressed the VA's findings in his decision, and gave careful consideration to the Plaintiff's treating physicians at the

VA.   [T. 24].   However, the ALJ correctly noted that a definition of "100%

unemployable," as utilized by the VA, was neither given, nor offered.   [T. 24].

Furthermore, at the Hearing, the ALJ offered the Plaintiff an opportunity to present,

for the Record, any documentation which would explain the basis for the VA's

disability rating of greater than 60%.   [T. 191-92].   The Plaintiff appears not to have

taken advantage of that opportunity.

In Jenkins v. Chater, supra, the plaintiff contended that the ALJ should rely on

the VA's finding of a disability.   Our Court of Appeals specifically noted that, "[t]his

Court has held that a disability determination by the Veterans Administration is not

binding on the ALJ."   Id. at 233, citing Title 20 C.F.R. § 404.1504; Fisher v. Shalala,

supra at 1262.   The Court  subsequently concluded that the plaintiff's argument, in

Jenkins, was without merit, and noted that the ALJ's determination was supported by

substantial evidence in the Record.   Id.

In defense of his argument, the Plaintiff cites Rodriguez v. Schweiker, 640 F.2d

682, 686 (5th Cir. 1981), for the proposition that the ALJ should have, in this matter,

given greater deference to the findings of the VA.   However, we find the circumstances

in Rodriguez to be inapposite.   There, the Court, while noting that the findings of

another agency are not binding on an ALJ, found that the ALJ should have scrutinized

and imbued the VA finding of "100% disability" with greater weight.  Id. at 686.

However, here, the Plaintiff has only provided objective evidence of a VA finding of

a "60% disability," which the ALJ rightly termed as a "considerable leap" from a total

disability. [T. 24]   Therefore,  we find that the ALJ was free to weigh the evidence

offered in the VA findings against the entirety of the Record, without abdicating his

critical function to determine whether a disability, as defined under the Social Security

Act, was substantially supported by this Record on the whole.

Furthermore, without further guidance as to the meaning of VA's use of

"unemployability," we lack an intelligible standard by which to assess the ALJ's

findings with those rendered by the VA.  As the ALJ explicitly noted in his opinion,

the VA rating physicians did not assess the claimant's ability to engage in lifting,

carrying, standing, walking, or sitting, and therefore, the VA rating opinion offered

minimal value in determining the Plaintiff's  RFC. [T. 22].

We recognize the importance that VA disability benefits play in assisting past

military servicemen with incapacitating injuries, and illnesses, and as a recognition of

our nation's indebtedness to those who have served, with devotion to duty, but the

eligibility for such benefits is determined by the VA, and we have been presented with

no authority that the VA rating would have either qualified the Plaintiff for benefits under a Listed Impairment, or at any other Step in the sequential analysis.

Given our independent review of the entire Record, we conclude that the ALJ considered the VA's assessments, and determined that those assessments were not persuasive in finding the Plaintiff disabled, under the Social Security Act, during the relevant time period.  As a result, we find no reversible error in this respect.

     3.    <u>Whether the ALJ Failed to Fully Develop the Record</u>
<u>and Include New and Material Evidence</u>.

     a.    <u>Standard of Review.</u>  As a general proposition, since the administrative proceedings are nonadversarial, the ALJ has an obligation to fully and fairly develop the Record, even when the claimant is represented by legal counsel. <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838 (8th Cir. 2002); <u>Cox v. Apfel</u>, 160 F.3d 1203, 1209 (8th Cir. 1998); <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994).  The ALJ is not required, however, to function as the Plaintiff's substitute counsel, but need only develop a reasonably complete Record. <u>Clark v. Shalala</u>, 28 F.3d 828, 830-31 (8th Cir. 1993); <u>Marks v. Barnhart</u>, 2002 WL 507012 at *7-*8 (D. Minn. March 28, 2001). When faced with an objection, that the ALJ has failed to properly develop the Record, the Court's inquiry must focus upon "whether [the Plaintiff] was prejudiced or treated

- 52 -

unfairly by how the ALJ did or did not develop the record" and, "absent unfairness or prejudice, we will not remand."  Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993); Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988).

Thus, we are obliged to review all of the evidence, even if that evidence was not before the ALJ, or the ALJ did not mention the evidence in his decision, in order to determine whether the ALJ's decision was supported by substantial evidence in the Record as a whole.

b.    Legal Analysis.   As we have noted, the ALJ received the additional 123 pages of medical records on October 8, 2003, which was one day prior before the issuance of his decision.  [T. 16, 28]. While its untimeliness would not be a sufficient basis, in our judgment, to decline to review the records, we have no means of knowing whether the ALJ did decline such a review.   Plainly, the ALJ did not reference, nor cite, any of the documents so submitted, but he did expressly note that he based his decision "[u]pon reviewing all of the evidence of record."  [T. 17].  What is equally plain, however, is that the Appeals Council did review those records and concluded that they were not material to the Plaintiff's claim -- a view we join.

Under the law of this Circuit, "an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  See, Black v. Apfel, 143 F.3d 383,

386 (8th Cir. 1998), citing <u>Montgomery v. Chater</u>, 69 F.3d 273, 275 (8th Cir. 1995). However, even if the ALJ had failed to notice those records, or they did not reach him until after his decision was issued, we would find no error, much less reversible error.

The records in question span the period from January 15, 2002, through September 23, 2003, and do not reflect any inconsistencies with the ALJ's findings, nor do they reveal any impairments, prior to the December 31, 2000, that were not thoroughly addressed by the ALJ. "In order to support a remand, new evidence must be 'relevant and probative of the claimant's condition for the timer period for which benefits were denied.'" <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002), quoting <u>Jones v. Callahan</u>, 122 F.3d 1148, 1154 (8th Cir. 1997). "Thus, to qualify as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." <u>Bergman v. Apfel</u>, 207 F.3d 1065, 1069-70 (8th Cir. 2000), citing <u>Jones v. Callahan</u>, supra at 1154. Furthermore, to be considered material, "it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." <u>Jones v. Callahan</u>, 122 F.3d 1148, 1154 (8th Cir. 1997), citing <u>Woolf v. Shalala</u>, 3 f.3d 1210, 1215 (8th Cir. 1993).

Here, we find that the new evidence is not relevant or material, as it relates to a time outside of the relevant period of disability, is cumulative of that considered by the ALJ, and is not probative of the Plaintiff's impairments at the time of the ALJ's finding of no disability.  In fact, the additional records tend to corroborate the earlier clinical findings which had been considered in the ALJ's determination.  For example, on September 23, 2002, Dr. Frank Grund noted, in a radiology report, that "[t]here is no scintigraphic [i.e., radiographic] explanation for the patient's recurrent low back pain," and "[s]pecifically, the fusion looks unremarkable, and there is no suggestion of facet syndrome."  [T. 52].  On September 23, 2003, during a follow-up visit, Dr. Jason Caron noted that "[the Plaintiff] had been doing well until about two years ago when he started developing worsening back pain," which "has progressively worsened over the last few years," and that "[the Plaintiff] was only taking aspirin for the pain and uses Flexeril to sleep at night."  [T. 72].  The date of that exam, occurring nearly three (3) years after the critical date by which the Plaintiff had to establish his disability, coupled with his relatively modest use of aspirin, would appear to corroborate the ALJ's findings as to the less than totally incapacitating nature of the Plaintiff's pain.

As to the Plaintiff's depression, which appeared to have proceeded in its tendency to "wax and wane," Dr. Cody continued to meet with the Plaintiff.  On

August 16, 2001, the Plaintiff reported that he had "been doing fairly well," and was "tolerating the back pain better." [T. 113]. On May 14, 2002, the Plaintiff reported that his mood was "pretty good," and that his "meds are working pretty well." [T. 104]. On December 30, 2002, the Plaintiff reported to a staff psychiatrist, Dr. Zaheer Aslam, that he was "taking his meds regularly, reports stable mood, good [concentration] and interest in daily activities," with "[n]o irritability." [T. 97]. Dr. Aslam had previously met with the Plaintiff about four (4) months earlier, and had reported that "[the Plaintiff] ran out of meds and felt irritable, tired, and is having sleep problems," but "[the Plaintiff's] mood is stable when he takes his medications." [T. 98-99].

While the Plaintiff urges us to conclude that the additional records warrant a remand to the ALJ, we are not persuaded that the records would allow any appreciable change in the ALJ's findings, and ultimate determination, in view of the fact that they solely relate to a period significantly after the date on which the Plaintiff's disability had to have been established. To the extent that the records may reflect a generalized deterioration of the Plaintiff's condition, such a development might not be unexpected given the Plaintiff's complaints that the ALJ noted, and accepted, in his decision. Nonetheless, the deterioration occurred well outside of the relevant period, and do not

merit a remand.  Therefore, we find and conclude, that the additional records are not material to the Record closely, and fully considered by the ALJ, and we reject, as without merit, the Plaintiff's assertion that the ALJ failed to fairly and fully develop the Record.

Accordingly, finding no error that would warrant the reversal of the ALJ's decision, we recommend that Summary Judgment be awarded to the Commissioner.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 25] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 28] for Summary Judgment be granted.

Dated:  December 16, 2005                    s/Raymond  L. Erickson

                                             Raymond L. Erickson
                                             CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than January 3, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 3, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.